## Carol Shields v. Rolland Gerhart, Director, Division of Licensing & Registrations, Social and Rehabilitation Services; Durwood Collier, Frederick Satink

[658 A.2d 924]

No. 92-452

Present: Allen, C.J., Gibson and Dooley, JJ., Fisher, D.J., and Peck, J. (Ret.), Specially Assigned

Opinion Filed January 27, 1995

*William A. Hunter*, Ludlow, for Plaintiff-Appellant.

*Jeffrey L. Amestoy*, Attorney General, Montpelier, and *Michael O. Duane*, Assistant Attorney General, Waterbury, for Defendants-Appellees.

**Dooley, J.** Plaintiff Carol Shields appeals the dismissal of her actions against the Department of Social and Rehabilitation Services (SRS) and its personnel based on the Vermont Constitution and 42 U.S.C. § 1983. Plaintiff argues that she has a private cause of action for damages under the Vermont Constitution, that sovereign immunity does not bar such a cause of action, and that her failure to serve defendants should not bar an action against them in their individual capacities. We affirm the dismissal of the actions against defendants in their individual capacities. On the state constitutional claims, we affirm, although on grounds different from those employed by the trial court.

The facts of this case are set forth in *Shields v. Gerhart*, 155 Vt. 141, 142-45, 582 A.2d 153, 154-56 (1990) (*Shields I*). Plaintiff owned and operated a child care facility and sued SRS and its agents when her day care facility license was revoked and her application to become a registered family day care home was denied. Plaintiff alleges that

defendants revoked her license and denied her application in retaliation for her public opposition to an SRS policy prohibiting corporal punishment. She further alleges that defendants used fraud and deception to induce her to abandon her license and forego her appeal rights by encouraging her to apply as a registered facility when they knew she could not qualify as such. As a result, plaintiff claims that defendants have deprived her of her property interest in her day care center in violation of the Civil Rights Act, 42 U.S.C. § 1983, and the Vermont Constitution.

In *Shields I*, we held that plaintiff's civil rights claims and Vermont constitutional claims were not time barred. 155 Vt. at 150, 582 A.2d at 159. We dismissed plaintiff's civil rights claims against SRS and other defendants in their official capacities because a state agency and its officials acting in their official capacities are not "persons" under 42 U.S.C. § 1983. *Id.* We left open the question of whether plaintiff could maintain a cause of action under the Vermont Constitution.

## I.

Plaintiff first appeals the trial court's denial of her motion for an enlargement of time to serve defendants in their individual capacities. She argues that because there would be no prejudice to defendants by late service, the court should have granted her motion. A motion to enlarge time will be granted only if the court finds, in its discretion, that "the failure to act was the result of excusable neglect." V.R.C.P. 6(b). Plaintiff, therefore, must show that the trial court abused its discretion in order to prevail on appeal. See *Miller v. Ladd*, 140 Vt. 293, 297, 437 A.2d 1105, 1108 (1981).

On January 29, 1988, plaintiff was granted permission to amend her original complaint and assert claims against defendants in their individual capacities. She never served defendants on the new claims, but moved for the enlargement of time over three years later, on February 22, 1991. In denying the motion, the trial court indicated that plaintiff's failure to effect service resulted from mere oversight which did not cross the threshold of excusable neglect. See 11 C. Wright & A. Miller, Federal Practice & Procedure § 2858, at 170 (1973) (gross carelessness and ignorance of law or facts are not enough to show excusable neglect). In light of the finding of oversight and the amount of time plaintiff had to effect service, the court reasonably concluded that her neglect was not excusable, and did not abuse its discretion. We therefore affirm the dismissal of plaintiff's claims against the defendants in their individual capacities.

## II.

Plaintiff next appeals the court's decision that she has no private cause of action under Chapter I, Articles 1 and 13 of the Vermont Constitution. The trial court reached this conclusion on three grounds: (1) no private right of action for money damages for violation of the Vermont Constitution is available; (2) even if such relief were available in appropriate cases, it is unavailable here because of the presence of alternative avenues for relief in the Vermont Tort Claims Act and "mechanisms for plaintiff to assert her position in the licensing process"; and (3) plaintiff's claims against defendants in their official capacities are barred by the state's sovereign immunity. In *Shields I*, we indicated a preference for deciding whether plaintiff has any valid claims before addressing possible defenses. Thus, we start by examining whether plaintiff has stated a claim on which damages could be awarded. For purposes of this issue, we assume it is irrelevant whether defendants were sued in their official or individual capacities.*

We find it unhelpful analytically to separate out whether money damages are ever available for state constitution violations from whether they are available in this case. Thus, we combine these questions.

In these unique circumstances, the inquiry into whether monetary relief is available to plaintiff is itself a two-step inquiry. First, we must determine whether the constitutional provisions involved are self-executing, that is, whether they support an action against the state or its agents without implementing legislation. Second, if we find a provision is self-executing, we must determine whether monetary damages are available as a remedy for a violation. See *Figueroa v.*

---

* Plaintiff has relied primarily on the reasoning of *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), which allowed a suit for damages for a violation of the Fourth Amendment. *Bivens* suits may be maintained only against individuals and not against the United States or its agencies. See *Federal Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 485-86, 114 S. Ct. 996, 1005-06 (1994). One state court, however, has adopted liability reasoning from *Bivens* but allowed a suit against the state or its employees in their official capacities, holding that sovereign immunity is not a defense. See *Corum v. University of North Carolina*, 413 S.E.2d 276, 291 (N.C. 1992). Another court relying on *Bivens* for its liability theory has rejected the individual capacity vs. official capacity distinction. See *Ritchie v. Donnelly*, 597 A.2d 432, 446 (Md. 1991) ("official/individual capacity dichotomy . . . does not apply to state constitutional violations"); *Widgeon v. Eastern Shore Hosp. Ctr.*, 479 A.2d 921, 927-28 (Md. 1984) (analyzing and relying on *Bivens*). In view of our disposition that there can be no damages liability whenever defendants are sued in their individual or official capacities, we do not reach whether the capacity of the defendants matters or whether sovereign immunity is available as a defense.

*State*, 604 P.2d 1198, 1206 (Haw. 1979); *Rockhouse Mountain Property Owners Ass'n v. Town of Conway*, 503 A.2d 1385, 1388 (N.H. 1986).

## A.

We note at the outset the preeminence of the Vermont Constitution in our governmental scheme. As the expression of the will of the people, a constitution stands above legislative or judge-made law. "[W]here a constitution asserts a certain right, or lays down a certain principle of law or procedure, it speaks for the entire people as their supreme law, and is full authority for all that is done in pursuance of its provisions." *Davis v. Burke*, 179 U.S. 399, 403 (1900). Therefore, the absence of legislative enabling statutes cannot be construed to nullify rights provided by the constitution if those rights are sufficiently specified. See *Gray v. Bryant*, 125 So. 2d 846, 851 (Fla. 1960); *Peper v. Princeton Univ. Bd. of Trustees*, 389 A.2d 465, 476 (N.J. 1978); cf. *Phillips v. Youth Dev. Program, Inc.*, 459 N.E.2d 453, 457 & n.4 (Mass. 1983) ("The absence of a statutory remedy for the violation of constitutional rights cannot absolutely and in all cases bar judicial protection of those rights."). But see *Bagg v. University of Texas Medical Branch*, 726 S.W.2d 582, 584 n.1 (Tex. Ct. App. 1987) (because no statute or case provides for redress of violation of constitutional right, there is no state constitutional tort akin to federal *Bivens* claim).

"The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws whenever he receives an injury." *Marbury v. Madison*, 1 U.S. 368, 378, 1 Cranch 137, 163 (1803). The Vermont Constitution mandates that "[e]very person within this state ought to find a certain remedy, by having recourse to the laws, for all injuries or wrongs which he may receive in his person, property or character . . . ." Vt. Const. ch. I, art. 4. Though Article 4 does not create substantive rights, it does ensure access to the judicial process. See *Levinsky v. Diamond*, 151 Vt. 178, 197, 559 A.2d 1073, 1086 (1989). The common law, which provides a remedy for every wrong, provides a remedy for violation of a constitutional right. See *Sheltra v. Smith*, 136 Vt. 472, 475, 392 A.2d 431, 433 (1978) (the law will remedy wrongs that merit redress). To deprive individuals of a means by which to vindicate their constitutional rights would negate the will of the people in ratifying the constitution, and neither this Court nor the Legislature has the power to do so.

In determining whether a constitutional provision is self-executing, most jurisdictions have measured their constitutions against the

standard adopted by the United States Supreme Court in *Davis v. Burke*:

> "A constitutional provision may be said to be self-executing if it supplies a sufficient rule by means of which the right given may be enjoyed and protected, . . . and it is not self-executing when it merely indicates principles, without laying down rules by means of which those principles may be given the force of law. . . ."
>
> . . . In short, if complete in itself, it executes itself.

179 U.S. at 403 (quoting Cooley, Constitutional Limitations 99 (1883)); see, e.g., *Clausing v. San Francisco Unified School Dist.*, 271 Cal. Rptr. 72, 78 (Ct. App. 1990); *State v. Sanabria*, 474 A.2d 760, 771 (Conn. 1984); *Gray v. Bryant*, 125 So. 2d at 851.

Determining whether a provision supplies a sufficient rule entails application of certain relevant criteria, no one of which is dispositive. First, a self-executing provision should do more than express only general principles; it may describe the right in detail, including the means for its enjoyment and protection. See *Convention Center Referendum Comm. v. Board of Elections & Ethics*, 399 A.2d 550, 552 (D.C. Ct. App. 1979). Ordinarily a self-executing provision does not contain a directive to the legislature for further action. *Id.* The legislative history may be particularly informative as to the provision's intended operation. *Id.* Finally, a decision for or against self-execution must harmonize with the scheme of rights established in the constitution as a whole.

■ Applying these general principles, we first consider whether Chapter I, Article 1 specifies a right enforceable against the state. Article 1 provides, in part:

> That all men are born equally free and independent, and have certain natural, inherent, and unalienable rights, amongst which are the enjoying and defending life and liberty, acquiring, possessing and protecting property, and pursuing and obtaining happiness and safety . . . .

Vt. Const. ch. I, art. 1. Applying the first of the above criteria, it is evident that this provision expresses fundamental, general principles, principles that infuse the rights of individuals and powers of government specified elsewhere in the constitution. See *Benning v. State*, 161 Vt. 472, 476, 641 A.2d 757, 759 (1994). Although the text includes the right to possess and protect property, that right is listed

"amongst" the "certain natural, inherent, and unalienable rights." This suggests that Article 1 does not establish an enforceable property right, but merely lists it to flesh out philosophical truisms. See *State v. Carruth*, 85 Vt. 271, 273-74, 81 A. 922, 923 (1911) (Article 1 is not "so certain and definite in character as to form rules for judicial decision"); *Lincoln v. Smith*, 27 Vt. 328, 339-40 (1855).

Moreover, recognizing a property right under Article 1 would lead to absurd consequences. The "right" to pursue and obtain happiness, couched in the same terms without qualification, follows plaintiff's claimed right to preserve and protect property. As such, the text of Article 1 prevents us from drawing a meaningful distinction between the two, and we see no basis for simply disregarding a portion of the constitutional text. To do so would constitute a legislative act not within the judicial power. If we were to find Article 1 self-executing, it would establish a "right" to call the state to task for infringing the right to pursue happiness, which makes no sense within a traditional conception of ordered liberty. See *Benning*, 161 Vt. at 477-78, 641 A.2d at 760.

■ Article 1 also makes no mention of a private plaintiff's recourse for state interference with property rights. The lack of a specific remedy should not itself defeat the contention that a constitutional provision is self-executing. As noted above, the law will provide a remedy for any right amenable to legal enforcement. Nevertheless, the absence of a specified remedy is evidence that Article 1 was not intended to be self-executing.

Turning to the second criterion, Article 1 contains no directive that the state legislature act to implement the asserted property right. Ordinarily, this would weigh in favor of a conclusion that the provision is self-executing. But the lack of a mandate is not surprising in light of the general nature of the rights described, and should not weigh heavily in favor of a conclusion that Article 1 is self-executing, especially given the specific protections for property interests found in Article 2, with which Article 1 is philosophically consistent.

The third criterion calls for examination of legislative history for guidance as to the intended effect of Article 1. Unfortunately, no record exists of any discussion or debate over the adoption of the Vermont Constitution. See J. Shaeffer, *A Comparison of the First Constitutions of Vermont and Pennsylvania*, in *In a State of Nature: Readings in Vermont History* 54, 58 (Muller & Hand eds. 1982). We noted in *Benning* that Article 1 was characteristic of constitutions of New England states which are "'basically philosophic documents

designed first and foremost to set a direction for civil society and to express and institutionalize a theory of republican government.'" *Benning*, 161 Vt. at 476, 641 A.2d at 759 (quoting Elazar, *The Principles and Traditions Underlying State Constitutions*, 12 Publius: The Journal of Federalism 18 (1982), in *State Constitutional Law: Cases & Materials* 30, 31 (1988)). Thus, to the extent drafting history exists, it does not support plaintiff's position.

█ Finally, we examine Article 1 in the context of the constitution as a whole to gauge its intended effect. The conclusion that the provision is not self-executing, and hence cannot serve as the basis for a cause of action, would not leave someone in plaintiff's position without recourse for state interference with property rights. Other more specific provisions provide the protections where the drafters found them necessary. At best, Article 1 is a restatement of the general requirement of due process of law. See *Anchor Hocking Glass Corp. v. Barber*, 118 Vt. 206, 219, 105 A.2d 271, 279-80 (1954). We have held, however, that Article 4 is the general analog to federal due process protections. See *Levinsky*, 151 Vt. at 197, 559 A.2d at 1086. In addition to due process protections, a private individual asserting a taking of property by the state has recourse in the mandatory compensation provisions of Article 2. Recognition of an enforceable right to preserve and protect property under Article 1 would, in many situations, render the guarantees found in Articles 2 and 4 redundant or superfluous. Thus, a cause of action under Article 1 is unnecessary to protect property interests. For the foregoing reasons, we conclude that Article 1 is not self-executing. Alone, it does not provide rights to individuals that may be vindicated in a judicial action. The trial court properly dismissed plaintiff's claim for wrongful deprivation of property under Article 1.

We have a different view, however, of plaintiff's claim under Article 13 for the alleged state infringement of her right to freedom of speech. Article 13 states:

> That the people have a right to freedom of speech, and of writing and publishing their sentiments, concerning the transactions of government, and therefore the freedom of the press ought not to be restrained.

Vt. Const. ch. I, art. 13.

█ Article 13 is largely undeveloped in our cases. The few decisions that mention it suggest its reach is coextensive with the

First Amendment to the United States Constitution. See, e.g., *Blouin v. Anton*, 139 Vt. 618, 622, 431 A.2d 489, 491 (1981). The one possible exception is *In re Morrissey*, 149 Vt. 1, 18-19, 538 A.2d 678, 689 (1987), where a discharged state employee claimed that his termination was in retaliation for protected speech and argued that Article 13 gave greater protections than the First Amendment in such cases because the Vermont provision focuses on speech "concerning the transactions of government." Following an Alaska decision, *Wickwire v. State*, 725 P.2d 695, 703 (Alaska 1986), we reserved judgment whether this language would give greater protection in some matters of public concern, concluding that the Article did not prevent the employee's termination in that case.

Our limited experience with Article 13 does not inhibit us from finding it to be self-executing. First, in contrast to Article 1, it unequivocally expresses more than general principles alone. It sets forth a single, specific right of the people to make themselves heard, a fundamental characteristic of democratic government.

Since Article 13 establishes a specific free speech right, the absence of a legislative directive supports a conclusion that the provision is self-executing. Indeed, it would make little sense to have the right to speak out on government matters depend on legislative enactment, considering the fundamental nature of citizen input in our republican form of government.

Finally, recognizing a self-executing right to free speech and to seek redress for its infringement comports with the general constitutional scheme. Article 3 does imply a right to expression in religious matters, but the right necessarily is limited. See Vt. Const. ch. I, art. 3. Nowhere else in the Chapter I Declaration of Rights can a general right to comment on the conduct of government be found. Article 13 creates a specific right to free speech that is crucial to the operation of government and vital to the effectuation of other enumerated rights. We hold that the provision is self-executing, and that it may serve as the basis for a private cause of action against the state.

### B.

Our decision that Chapter I, Article 13 is self-executing, and that it supports an action against the State of Vermont, gets plaintiff over only one of two hurdles necessary to avoid a motion to dismiss for failure to state a claim on which relief can be granted. The fact that the constitutional provision is self-executing means only that the rights contained therein do not need further legislative action to

become operative. It does not necessarily mean that monetary damages is the proper remedy for a violation. See *Rockhouse Mountain Property Owners Ass'n*, 503 A.2d at 1388. For plaintiff to prevail, we must find that Article 13 supports an action for damages.

■  In arguing that damages are available for breach of a duty imposed by the Vermont Constitution, plaintiff relies primarily on the United States Supreme Court decision in *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971). In *Bivens*, the Court held that a federal agent acting under color of his authority could be sued for damages for violating plaintiff's Fourth Amendment rights to be free from unreasonable searches and seizures. *Id.* at 389. The decision is significant because Congress has provided no statutory remedy for such a violation, so the Court held that the Fourth Amendment itself supported the remedy.

In support of its holding, the Court found that "damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty," *id.* at 395, and that the federal courts may ordinarily use any available remedy in enforcing federal statutory rights. *Id.* at 396. It also noted two possible exceptions to its general holding, but found neither applicable: (1) the presence of "special factors counselling hesitation in the absence of affirmative action by Congress," *id.*; (2) the presence of an "explicit congressional declaration" that plaintiff could not recover damages "but must instead be remitted to another remedy, equally effective in the view of Congress." *Id.* at 397.

Later decisions applied the *Bivens* rationale to a suit to obtain a remedy for violation of the Fifth Amendment's equal protection guarantee, *Davis v. Passman*, 442 U.S. 228, 245-48 (1979), and to a prisoner's suit for relief because of an asserted violation of the Eighth Amendment's proscription against cruel and unusual punishment. *Carlson v. Green*, 446 U.S. 14, 19-23 (1980). In *Carlson*, the Court held that the availability of damages from the United States government under the Federal Tort Claims Act did not prevent a suit directly on the Eighth Amendment, in part because the constitutional tort suit is against the individual federal agents who violated plaintiff's constitutional rights. *Id.* at 21. The Court reasoned that "[b]ecause the *Bivens* remedy is recoverable against individuals, it is a more effective deterrent than the FTCA remedy against the United States." *Id.*

The remaining cases in the *Bivens* line are particularly significant because they deal with cases more similar to this one, and they more fully develop the exceptions to the availability of the damages remedy.

In *Bush v. Lucas*, 462 U.S. 367 (1983), the plaintiff was fired from an engineering job at a federal installation, in part for making critical comments to the media about his superiors. Although the plaintiff was eventually reinstated in the appeals process, with backpay, he brought a *Bivens* action alleging violations of his First Amendment rights. Although the Court found that Congress had not expressly denied petitioner a *Bivens* remedy or established an equally effective substitute, it held that no *Bivens* action was maintainable. *Id.* at 390. After reviewing the history of the development of personnel rights and remedies in the federal system, the Court summarized the issue:

> The question is not what remedy the court should provide for a wrong that would otherwise go unredressed. It is whether an elaborate remedial system that has been constructed step by step, with careful attention to conflicting policy considerations, should be augmented by the creation of a new judicial remedy for the constitutional violation at issue. The question obviously cannot be answered simply by noting that existing remedies do not provide complete relief for the plaintiff. The policy judgment should be informed by a thorough understanding of the existing regulatory structure and the respective costs and benefits that would result from the addition of another remedy for violations of employees' First Amendment rights.

*Id.* at 388. Finding that the prospect of damages liability would deter employers from imposing discipline, the Court concluded that the Congress was in a better position to weigh the competing considerations and determine whether a damages remedy was appropriate. See *id.* at 389.

The themes of *Bush* were further developed in *Schweiker v. Chilicky*, 487 U.S. 412 (1988), where former Social Security disability recipients sought money damages against program administrators, claiming that an eligibility reevaluation program that resulted in the termination of their benefits was administered in a way that denied them due process. They alleged the use of various procedures, including termination quotas, intended to deny benefits to eligible persons. Their benefits were restored in the appeal process, but they sought damages for emotional distress and loss of necessities of life.

The Court explained that the exception to *Bivens* liability where there are "special factors counselling hesitation" included "an appropriate judicial deference to indications that congressional inaction has not been inadvertent." *Id.* at 423. After analyzing the administrative

remedies available to recipients, the Court found that the case was indistinguishable from *Bush*. The Court was particularly struck by the fact that Congress was aware of and agreed with the plaintiffs' claims but did not create the remedy they sought:

> We agree that suffering months of delay in receiving the income on which one has depended for the very necessities of life cannot be fully remedied by the "belated restoration of back benefits." . . . Congress, however, has addressed the problems created by the state agencies' wrongful termination of disability benefits. Whether or not we believe that its response was the best response, Congress is the body charged with making the inevitable compromises required in the design of a massive and complex welfare benefits program. . . . Congress has discharged that responsibility to the extent that it affects the case before us, and we see no legal basis that would allow us to revise its decision.

*Id.* at 428-29 (citation omitted).

*Bush* and *Chilicky* represent some retrenchment from at least the rationale of *Bivens*. The Court apparently abandoned its requirement of an "equally effective alternative remedy" in order to obviate the need for a damages remedy. Indeed, the "special factors counselling hesitation" now focus on alternative remedies without regard to the strictures of *Carlson*. The Court is far more likely to defer to Congress in fashioning a remedy. See generally Nichol, *Bivens, Chilicky, and Constitutional Damages Claims*, 75 Va. L. Rev. 1117 (1989); Brown, *Letting Statutory Tails Wag Constitutional Dogs – Have the Bivens Dissenters Prevailed?*, 64 Ind. L.J. 263 (1989).

We have not heretofore decided whether a *Bivens* damage remedy is available under the Vermont Constitution. See *Doria v. University of Vermont*, 156 Vt. 114, 119, 589 A.2d 317, 320 (1991); *Shields I*, 155 Vt. at 148, 582 A.2d at 158. Our constitutional precedents are unhelpful. We have recognized a private right of action for damages caused by a government taking of private property in violation of Chapter I, Article 2, see *Winn v. Village of Rutland*, 52 Vt. 481, 494-95 (1880), but the remedy is specifically authorized by the constitutional text. Our decision that no private right of action is available to enforce Article 6, *Welch v. Seery*, 138 Vt. 126, 128, 411 A.2d 1351, 1352 (1980), is actually a holding that the article is not self-executing. Similarly, our decision that Article 4 does not afford "additional private tort remedies" for violation of the open meeting law, *Rowe v. Brown*, 157

Vt. 373, 379, 599 A.2d 333, 337 (1991), goes to the substantive content of that article.

Although the *Bivens* decision provides little rationale beyond the common-law preference for the award of damages as a remedy, it has generally been considered a specific application of the general power of the judiciary to imply remedies for violations of specific legal standards. The general principle is set out in Restatement (Second) of Torts § 874A (1979), which provides:

> When a legislative provision protects a class of persons by proscribing or requiring certain conduct but does not provide a civil remedy for the violation, the court may, if it determines that the remedy is appropriate in furtherance of the purpose of the legislation and needed to assure the effectiveness of the provision, accord to an injured member of the class a right of action, using a suitable existing tort action or a new cause of action analogous to an existing tort action.

As used in this section, the term "legislative provision" includes a constitutional provision. *Id.* comment a. The principle is well ingrained in our law. See *School Dist. No. 1 v. Kittridge*, 27 Vt. 650, 653-54 (1855) ("It is a common principle, that, when a duty is imposed by law, an action can be sustained by those to whom that duty is owing, for such damages as have been sustained by any neglect in its performance.").

We have been careful in applying this principle in areas where the Legislature has acted to create some remedy, looking for "legislative intent, explicit or implicit, to create a private tort remedy." *Rowe v. Brown*, 157 Vt. at 378, 599 A.2d at 336; see also *Wilder v. Aetna Life & Cas. Ins. Co.*, 140 Vt. 16, 19, 433 A.2d 309, 310 (1981) (no private right of action for violation of Insurance Trade Practices Act where Legislature provided public administrative sanctions). In *Cronin v. State*, 148 Vt. 252, 254, 531 A.2d 929, 930 (1987), a state employee sued the state and two other state employees for damages for violation of a regulation prohibiting disclosure of confidential employment information. In response to an inquiry by plaintiff's brother-in-law, the employees disclosed that there was an office rumor that plaintiff was having an affair with a co-worker. We declined to recognize a private right of action for damages because the scope of the regulation suggested it was not promulgated for the special benefit of employees, and the Legislature had created an administrative scheme for enforcing state personnel regulations. *Id.* at 255, 531 A.2d at 931. We

noted that the statutory scheme "contemplates that the decision with respect to the manner in which violations of personnel regulations should be remedied should be within the discretion of the Commissioner of Personnel. A private right of action would potentially interfere with the exercise of this discretion." *Id.*

We have been cautious in creating a private damage remedy even where the Legislature has provided no alternative civil remedy. In *O'Brien v. Island Corp.*, 157 Vt. 135, 140-41, 596 A.2d 1295, 1298 (1991), we declined to create a tort remedy for violation of a boiler safety statute. In specifically considering § 874A of the Restatement, we reasoned:

> There is serious doubt about whether the Legislature intended that a civil remedy exist for a violation of § 241. . . . While this Court may determine that such a remedy is appropriate in furtherance of the legislative purpose, Restatement (Second) of Torts § 874A (1979), it should be hesitant to do so when it is clear that the Legislature could have done so, knew it could do so, and did not do so.

*Id.* at 140 n.3, 596 A.2d at 1298 n.3; cf. *Robitaille v. Rubin*, 159 Vt. 152, 154, 615 A.2d 1025, 1025-26 (1992) (failure of seller of land to show buyer Act 250 permit, as required by permit, not a defense to breach of the sales contract, where Legislature did not create civil remedy for breach of permit condition).

We are also influenced by the decisions from other states that have addressed this issue. In the years immediately following the *Bivens* decision, a number of courts adopted its holding for state constitutional violations with virtually no reasoning. See generally Friesen, *Recovering Damages for State Bills of Rights Claims*, 63 Tex. L. Rev. 1269, 1276-79 (1985) (collecting cases). An example of these cases is *Gay Law Students Ass'n v. Pacific Tel. & Tel. Co.*, 595 P.2d 592, 602, 156 Cal. Rptr. 14, 24 (1979), where gay individuals employed by, or denied employment by, defendant sought damages because of discriminatory treatment based on their sexual orientation in violation of a provision of the California Constitution. Citing *Bivens*, but without any discussion of the remedy question, the California Supreme Court held that plaintiffs' complaint stated a cause of action.

Some decisions have refused to fashion a monetary damages remedy even for a constitutional violation similar to that in *Bivens*, holding that only the legislature can create this remedy. See, e.g., *Hunter v. City of Eugene*, 787 P.2d 881, 884 (Or. 1990). The more

recent decisions, particularly those issued after *Bush* and *Chilicky*, tend to be more cautious about accepting *Bivens*, and adopt part or all of the reasoning of *Bush* and *Chilicky*.

Where damages must be recognized to give a plaintiff some remedy, the *Bivens* rationale is most likely to be followed. See *Bivens*, 403 U.S. at 410 (Harlan, J., concurring) ("For people in Bivens' shoes, it is damages or nothing."). An example of this kind of case is *Moresi v. Department of Widlife & Fisheries*, 567 So. 2d 1081, 1093 (La. 1990), where the Louisiana Supreme Court recognized a private right of action for damages for breach of the search and seizure section of the Louisiana Constitution. The plaintiffs were duck hunters whose boat was searched by game agents and who were detained for determination whether they had violated game laws. In accepting the *Bivens* damage remedy, the court stated that "[r]ecovery of damages is the only realistic remedy for a person deprived of his right to be free from unreasonable searches or seizures." *Id.*

Where, however, other remedies exist as part of a statutory scheme fashioned by the legislature, the decisions show reluctance to add a damages remedy. We visit some of these decisions to examine their reasoning.

In *Kelley Property Dev., Inc. v. Town of Lebanon*, 627 A.2d 909, 919-24 (Conn. 1993), the Connecticut Supreme Court considered whether a developer who alleged he was denied due process in the processing of his housing development application could sue the town, the town planning and zoning commission, and the members of the commission for damages under the state constitution. The court evaluated the *Bivens* line of cases and concluded that under them the developer had to show he "would lack any remedy for alleged constitutional injuries if a damages remedy were not created." *Id.* at 921. For three itemized reasons, it decided to follow a similar policy. First, it concluded the administrative remedies available to a zoning applicant, when combined with traditional tort remedies, "are particularly appropriate in light of the fact that the [town] officials whose conduct allegedly violated [plaintiff's] state constitutional rights are not professionals but are laypersons with little or no technical expertise." *Id.* at 923. Second, the threat of liability was likely to "have a chilling effect on the zeal with which zoning commissions and their members undertake their responsibilities." *Id.* at 924. Third, the availability of the *Bivens* remedy "would encourage its pursuit by any disappointed zoning applicant whenever a zoning agency denies the sought after permit or application." *Id.* The holding of *Kelley* is that

"as a general matter, we should not construe our state constitution to provide a basis for the recognition of a private damages action for injuries for which the legislature has provided a reasonably adequate statutory remedy." *Id.* at 922.

Although the decisions are less detailed, virtually all of the cases have followed the *Kelley* rationale where the plaintiff has an administrative or common-law remedy to obtain the governmental benefit or license sought or the restoration of employment or the like. For example, a damages claim by a low bidder for a public construction, alleging a denial of due process in the rejection of the bid, was dismissed because of the availability of a contract remedy and the fear of "endless lawsuits by disappointed bidders." *King v. Alaska State Housing Authority,* 633 P.2d 256, 260-61 (Alaska 1981). In *Provens v. Stark County Bd. of Mental Retardation,* 594 N.E.2d 959, 965-66 (Ohio 1992), the Ohio Supreme Court dismissed a damages claim based on the Ohio Constitution by a public employee that her employer had discriminated against her in retaliation for her public criticism of the agency's operations. It found that the plaintiff's rights were protected by the Ohio Civil Rights Commission and collective bargaining arbitration so that she had "sufficiently fair and comprehensive remedies," *id.* at 965, and deferred to the legislature in designing the appropriate remedies. *Id.*; see also *Rockhouse Mountain Property Owners Ass'n,* 503 A.2d at 1388-89 (damages inappropriate remedy for equal protection violation in refusal to lay out road because appeal of refusal is adequate remedy); *Corum v. University of North Carolina,* 413 S.E.2d 276, 289, 291 (N.C. 1992) (suit by discharged faculty member, alleging retaliation for free speech protected by state constitution, and seeking reinstatement and damages, can go forward "in the absence of an adequate state remedy" and where no "established claims and remedies . . . provide an alternative to the extraordinary exercise of its inherent constitutional power").

■ We conclude that the approach adopted by the Connecticut Supreme Court in *Kelley Property Development,* and used at least in part by the foregoing decisions, best reflects our existing law on enforcement of statutory rights by implied actions for damages. It is also consistent with the *Bivens* line of cases as they have developed in the United States Supreme Court. We agree that it may be appropriate to imply a monetary damages remedy to enforce constitutional rights where the Legislature has fashioned no other adequate remedial scheme. Where the Legislature has provided a remedy, although

it may not be as effective for the plaintiff as money damages, we will ordinarily defer to the statutory remedy and refuse to supplement it.

## III.

With the legal principles in mind, we examine the specific claim plaintiff makes and the availability of other remedies. Based on the earlier opinion in this case, the key allegations are:

(1) plaintiff was advised that the failure of her septic tank would be grounds for revocation of her day care facility license, but she could run a registered family day care home;

(2) in reliance on this advice, plaintiff applied to be a registered family day care home and did not disclose the septic tank failure on her application;

(3) one of the SRS workers then came to plaintiff's home and told her that because of her failure to disclose the septic problem, her application would be denied, her facility license would be revoked effective three days later, she could not obtain a hearing on the denial, if there were a hearing, she could not operate pending its outcome, and if she continued to pursue her application, she would be required to put in an expensive mound system;

(4) as a result of the worker's statement, plaintiff sent in her license to SRS on May 21 or 22, 1984, effective May 25, to avoid having to install a mound system;

(5) before the license was received by SRS, the Director of the Division of Licensing of SRS sent a notice revoking plaintiff's facility license, effective June 24, 1984, and denying registration as a family day care home.

According to plaintiff's complaint, all these actions were taken to retaliate against her for publicly and successfully challenging SRS policy on the use of corporal punishment in day care facilities. Thus, plaintiff alleges that the revocation of her license to run a day care facility, and the denial of registration as a family day care home, were done to punish her for exercising her freedom of speech protected by Chapter I, Article 13.

At the time the events in the complaint occurred, plaintiff had a right to appeal both the revocation and the application denial to the Human Services Board. See 3 V.S.A. § 3091(a). The revocation could become effective only "after hearing" although immediate suspension was possible in circumstances "which immediately imperil the health,

safety or well-being of persons in the care of the licensee." 33 V.S.A. § 306(b)(3). In 1987, the United States District Court ruled that the appeal process did not comport with due process of law in revocation cases because no prerevocation hearing was available within SRS and the Human Services Board could not review the sanction chosen by SRS. *Gour v. Morse,* 652 F. Supp. 1166, 1171 (D. Vt. 1987); see *Huntington v. Department of Social & Rehabilitation Serv.,* 139 Vt. 416, 417-18, 430 A.2d 460, 462 (1981) (disagreement with SRS sanction not grounds for reversal by Human Services Board as long as SRS decision is in compliance with applicable law). Thereafter, SRS modified its regulations to provide a prerevocation hearing within SRS. See, e.g., Vermont Dep't of Social and Rehabilitation Serv., Children's Day Care Licensing Regulations for School Age Care in 4 Code of Vermont Rules 13162001-037 (Apr. 1993).

▆▆▆ From her complaint, it is clear that the injury for which she wants damages is the loss of the property interest in her family day care home license. Thus, she alleges that had she been given a fair hearing, she could have satisfactorily answered all of the matters in the letter revoking her license and denying her application.

Plaintiff never sought restoration of her facility license either by administrative appeal to the Human Services Board or in this action. There is no indication that she ever sought to operate a day care facility or family day care home again.

Although plaintiff seeks to vindicate her right to free speech, the remedy sought seeks to make her whole because of her inability to operate a child care facility or registered child care home. This is exactly the injury that the remedies provided by the Legislature seek to avoid by giving applicants or licensees an opportunity to contest adverse decisions. We see no reason why her retaliation claim could not have been adjudicated by the Human Services Board. Cf. *In re Morrissey,* 149 Vt. at 14-19, 538 A.2d at 686-89 (similar retaliation claim in employment context adjudicated by Vermont Labor Relations Board).

We are not persuaded that the statutory remedies are inadequate because plaintiff was "tricked" into foregoing them. Even plaintiff's complaint indicates that the advice she received on the availability of an administrative remedy was equivocal, and it further indicates that she had used administrative remedies successfully in the past. To the extent she may have been unfairly denied access to administrative remedies, the courts are open to ensure she received due process of law. See *Gour v. Morse,* 652 F. Supp. at 1171.

On the other hand, we are persuaded that allowing monetary damages in cases like this would threaten to eviscerate the administrative scheme the Legislature has adopted. Rather than diligently attempting to avoid the injury by an immediate attempt to remain open, this plaintiff has allowed damages to mount through the passage of time with no opportunity for defendants to minimize the injury. As the Connecticut court found, a damages remedy is bound to have a chilling effect on state officials who are required to protect the health and safety of children in day care, while treating operators fairly. To the extent that the fear of damage liability, whether incurred by individual employees or the state agency, tips the balance of protection in favor of operators and against children, the results may be unacceptable.

We conclude that plaintiff had an adequate remedy for the loss of her day care facility license and denial of her registration application and, accordingly, she has no suit for damages for the same injury.

## IV.

For the foregoing reasons, we conclude that the superior court properly dismissed plaintiff's complaint. Because of our disposition of the merits of plaintiff's complaint, we do not need to decide whether plaintiff's claims are also barred by the state's sovereign immunity.

*Affirmed.*