## Susan Jacobs v. State Teachers' Retirement System of Vermont

[816 A.2d 517]

No. 01-474

Present: **Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.**

Opinion Filed September 6, 2002

*Motions for Reargument and Amendment Denied November 27, 2002*

*Charles F. Storrow* of *Kimbell & Storrow*, Montpelier, for Plaintiff-Appellant.

*William H. Sorrell*, Attorney General, and *Bridget C. Asay*, Assistant Attorney General, Montpelier, for Defendant-Appellee.

**Dooley, J.** Plaintiff Susan Jacobs sued defendant State Teachers' Retirement System of Vermont ("the System") for denying her certain retirement benefits. The parties filed cross-motions for summary judgment, and the trial court found for defendant based on sovereign immunity. On appeal, plaintiff argues that the trial court erred in two respects: by finding that the System was protected by sovereign immunity, and by concluding that the State did not waive its immunity. We affirm.

"In reviewing a decision to grant summary judgment, we regard all allegations made in opposition to the motion as true if supported by affidavits or other evidentiary material." *LaShay v. Dep't of Soc. & Rehab. Servs.*, 160 Vt. 60, 62, 625 A.2d 224, 225-26 (1993). The facts according to the plaintiff are as follows. Plaintiff was a school teacher for twenty-eight years in the Vermont public school system after teaching in New York City public schools for seven years. While she taught in Vermont, she was a member of the System, as all public school teachers were required to be by statute. See 16 V.S.A. § 1933(a). Until 1981, the System offered just one retirement plan, the Group A plan. The Group A plan was contributory, funded partially by a 5.5% salary deduction. See *id.* § 1944(b)(2). In 1981, the System's enabling act was amended to create a second retirement plan, the Group B plan. This second plan was noncontributory and thus was totally funded by the state and by investment income and not by member contributions. Membership in the Group B plan was optional, but members had a limited time to elect whether they wished to switch to the new plan or remain covered by the old plan. See *id.* §1950(a). The System, in order to help members make this decision, was statutorily required to give a "general written explanation of the election and its consequences." See *id.* § 1950(b). In order to meet this requirement, the System mailed out an informational flyer comparing the two retirement plans.

Under the statute, members who converted from Group A to Group B would keep all service credit earned as a Group A member, forfeit future benefits under Group A, and become entitled to the benefits under Plan B. See *id.* § 1950(c). Importantly, upon switching they would receive a refund of all their "accumulated contribution balance," consisting of their contributions to the original plan, plus interest. See *id.* §§ 1931(1), 1950(c). Further, a member of Plan A could also purchase up to ten years of service credit for any time spent teaching in public schools outside of Vermont. See *id.* § 1944(b)(6)(A). Money put towards purchasing such

credit became part of the member's accumulated contribution balance, see *id.*, and would thus be refunded to any member who changed from Plan A to Plan B. See *id.* § 1950(c). Because switching members retained all of their service credit under Plan A, members could obtain up to ten years of service credit by buying it while under Plan A and then transferring to Plan B, receiving the purchase price back as part of their refunded accumulated contribution balance as a result of the transfer.

The leaflet circulated by the System to members made it clear that they would be unable to acquire such out-of-state service credit under Plan B, and that if they were considering such a purchase, they should do so before changing plans. However, neither the leaflet sent by the System nor the handbook circulated to members explicitly stated that the accumulated contribution refund would include money put towards the purchase of out-of-state credit.

Plaintiff opted for Plan B in 1981, but did not purchase any service credit for her seven years teaching experience in New York City "[d]ue to a variety of factors." Aside from there being no explicit statement in the written materials sent to her by the System that the purchase price of any service credit would be refunded, plaintiff claims there were other reasons she did not obtain the credit. The language of the System's flyer and handbook spoke in terms of "purchasing" credit, which indicated to plaintiff that the System kept that money, not that it could be returned. Despite this misconception, plaintiff still had some interest in acquiring the credit and contacted the System. She claims that in a telephone conversation with a System representative in which she inquired about purchasing credit, the representative did not mention that the purchase price would be refunded along with her accumulated contribution balance.

In 1990, the Group B plan was dissolved, and plaintiff, along with all of the other former Group B members, was automatically transferred to Group C, a new contributory plan that allowed the acquisition of out-of-state service credit again. Between 1998 and 1999, plaintiff became interested in buying service credit under this plan because she could become eligible for early retirement with full benefits if she obtained credit for her work in New York. During this time, she received a memorandum from the Vermont chapter of the National Education Association informing her that the purchase price for procuring service credit under the Group A plan would have been included in the refund received in 1981 after transferring to Group B. With this new knowledge, plaintiff asked the System to give her service credit for her work in New York without payment, but this request was denied by System staff.

Plaintiff eventually paid approximately $70,000 to get the service credit she needed for early retirement.

Plaintiff brought a class action suit against the System to recover that money plus interest, claiming that the System had breached statutory and fiduciary duties to accurately inform her and those similarly situated of the consequences of switching from Plan A to Plan B. In two counts, she claimed that the System's failure to accurately inform her and the class was negligent [count I], and breached a duty to deal with her and the class "fairly and in good faith" [count II]. In addition to the approximately $70,000 in issue for plaintiff, the complaint sought similar relief for the class members.

The superior court denied the motion to certify the class, concluding that "plaintiff appears more in a class by herself." Both parties filed cross-motions for summary judgment. The court found that the System was part of the state government and, as a result, was protected by sovereign immunity unless the State had waived such immunity. It rejected two theories of waiver. First, it rejected the theory that the System's obligation to provide the information was contractual and that the State had waived sovereign immunity by entering into the contract. It found instead that any liability would have to be based on tort.

Second, it rejected plaintiff's theory that if the action were characterized as one in tort, sovereign immunity was waived by the Vermont Tort Claims Act, 12 V.S.A. §§ 5601-5606. The court held that the suit fell within one of the exceptions for state tort claim liability for "any claim arising out of ... misrepresentation." *Id.* § 5601(e)(6). The court based its decision on interpretations of the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680 (1993 & Supp. 2002), upon which Vermont's statute is based.

Because the court found that the System was protected by sovereign immunity, and that such immunity had not been waived, it granted summary judgment for the System. Jacobs appeals from that decision arguing that: (1) the System is not an arm of the State and is, therefore, not covered by sovereign immunity; and (2) sovereign immunity does not apply to this action because it is based on a breach of contract or a tort theory covered by the Vermont Tort Claims Act.

In reviewing a summary judgment decision, we apply the same standard as the trial court: "summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Kelly v. Lord*, 173 Vt. 21, 42, 783 A.2d 974, 990 (2001). Because the System is created by remedial legislation, we must construe these statutes liberally in favor of their

beneficiaries. See *Duhaime v. Treasurer*, 161 Vt. 157, 160, 636 A.2d 754, 756 (1993).

We start with the issue of whether the System is covered by sovereign immunity. The concept of sovereign immunity has generally embodied two principles: citizens cannot sue a state in that state's own courts without its consent; and the state is immune from torts committed by its agents. See 1 Civil Actions Against State and Local Government § 1.1, at 2 (J. Craig ed., 2d ed. 1992). The reasons for such a policy include the protection of the operation of state government from interference by the judiciary and by private citizens, elimination of the burden on the State of defending lawsuits, and insulation of the state treasury from litigation claims. *Id.* §1.2, at 8-9. This doctrine is not without its criticisms, for example, that sovereign immunity subordinates the interests of injured citizens to those of the public treasury. See *Roman Catholic Diocese of Vt., Inc. v. City of Winooski Hous. Auth.*, 137 Vt. 517, 519, 408 A.2d 649, 650 (1979). Such criticisms have weakened the doctrine, see 1 Civil Actions Against State and Local Government, *supra*, § 1.8, at 23 (describing how many jurisdictions have abrogated judicially-created sovereign immunity), but not eliminated it in Vermont. Because sovereign immunity is procedural, a state may choose to waive it in specified circumstances. See *Denis Bail Bonds, Inc. v. State*, 159 Vt. 481, 484-85, 622 A.2d 495, 497-98 (1993). Such waiver must be accomplished expressly by statute. *LaShay*, 160 Vt. at 67, 625 A.2d at 228.

Sovereign immunity protects only the state and its components. See *Levinsky v. Diamond*, 151 Vt. 178, 183, 559 A.2d 1073, 1077 (1989) (sovereign immunity protects only the state itself), *overruled on other grounds by Muzzy v. State*, 155 Vt. 279, 280, 583 A.2d 82, 83 (1990). Here, plaintiff argues that the System is not an arm of the State for purposes of sovereign immunity. This is an issue of first impression in Vermont.

Although we have not addressed this issue, it has been addressed in other jurisdictions. The most fertile source of law in the area relates to the Eleventh Amendment to the United States Constitution, which provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." It represents a form of sovereign immunity, protecting states from having to defend litigation brought by citizens against them in federal court without consent. 2 Civil Actions Against State and Local Government, *supra*, § 10.2, at 53.

There is no definitive test for determining whether a particular entity is an arm of the state such that a suit against it will be barred by sovereign

immunity. As Justice O'Connor noted with respect to the Eleventh Amendment, without definite guidance courts "have struggled, variously adding factors, . . . distilling factors . . . and deeming certain factors dispositive." *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 59 (1994) (O'Connor, J., dissenting); see generally Note, *Clothing State Governmental Entities with Sovereign Immunity: Disarray in the Eleventh Amendment Arm-of-the-State Doctrine*, 92 Colum. L. Rev. 1243 (1992). While jurisdictions continue to differ in their analyses, two factors have been used most commonly in cases like that before us.

The first factor is whether a judgment against the entity will be paid for by the state. See *Am. Trucking Ass'ns v. Conway*, 146 Vt. 579, 587, 508 A.2d 408, 414 (1986) (Legislature, not court, should determine state's liability for money damages); *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 464 (1945) ("[W]hen the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit . . . ."), *overruled on other grounds by Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 614-15, 122 S. Ct. 1640, 1641-42 (2002); *Carter v. City of Philadelphia*, 181 F.3d 339, 347 (3d Cir. 1999) (one of three factors the court examines is "the source of funding — *i.e.*, whether payment of any judgment would come from the state's treasury"); *Feeney v. Port Auth. Trans-Hudson Corp.*, 873 F.2d 628, 631 (2d Cir. 1989) ("[W]hether liability will place the state treasury at risk, although not exclusively determinative, is the single most important factor."); *Ram Ditta v. Md. Nat'l Capital Park & Planning Comm.*, 822 F.2d 456, 457 (4th Cir. 1987) ("[I]t is generally held that the most important consideration is whether the state treasury will be responsible for paying any judgment that might be awarded."); *Blake v. Kline*, 612 F.2d 718, 724 (3d Cir. 1979) ("Inquiry must also be made as to whether the [entity] has sufficient funds in its segregated account to meet [plaintiff's] claim or whether resort to general funds of the state treasury will be required."). This is considered by most courts to be the critical factor, and for some it is the dispositive factor. *Hess*, 513 U.S. at 49. This factor deals solely with monetary considerations and consequences.

In evaluating this factor, we examine what effect holding the System liable for plaintiff's claim would have on the state treasury. Money to pay for state teachers' pensions comes from one of three sources: contributions by teachers from their salary, state appropriations, and money earned by investing the money derived from the other sources. The Legislature determines its appropriation to the System on an actuarial basis. See 16 V.S.A. § 1944(c)(2). Under the statute, an actuary is

appointed to appraise how much money the System should request from the Legislature. See *id.* § 1942(l), (r). The six member board of trustees that oversees the System then annually reviews the amount suggested by the actuary "as necessary to achieve and preserve the financial integrity of the funds established" under the statute. See *id.* § 1942(r). Based on that review, the board recommends how much the state should contribute for the next fiscal year in order to maintain the funds and submits that recommendation to the Governor, who makes a budget recommendation to the Legislature. See *id.* The "state" is obligated to pay into the pension accumulation an amount determined by a specified actuarial cost method. See *id.* § 1944(c)(2).

We recognize that the Legislature cannot be bound to appropriate the exact amount supported by the actuary every year, but the Legislature sets by statute the eligibility rules and amount of benefits and necessarily is required to ensure that funds are available to pay the statutory obligations. Thus, the Joint Special Retirement Study Committee, in its Report to the Vermont General Assembly, characterized the State's role as absorbing "whatever funding obligations are required to ensure that the statutory benefits are available now and in the future." Joint Special Retirement Study Committee, *Report to the Vermont General Assembly*, Adj. Sess. 5 (2000). This funding obligation is substantial. In fiscal years 2000 and 2001, the Legislature appropriated to the System $18,586,240 and $19,500,000, respectively, with these amounts constituting over half of the System's funding.

Although any damages plaintiff recovers from the System might come from money contributed by employees or earned by investment, it seems apparent that the State will ultimately bear the cost because it is the funder of last resort. Nevertheless, plaintiff argues that this factor actually weighs against the application of sovereign immunity because the Legislature is not required to appropriate the actuary-derived amount and has not done so, the money plaintiff seeks would come from her own contribution, and the judgment would not have an immediate effect on the state appropriation. We do not find these arguments persuasive.

First, plaintiff argues that the Legislature is not bound by the actuary's recommendation and has failed to meet its funding obligation in the past. It is true that the only statutorily imposed mandate is that the State must contribute to the pension fund based on an actuarial calculation. See 16 V.S.A. § 1944(c)(2). Otherwise, there is no specific statutory provision that declares that the State will act as guarantor of the System's obligations. Jacobs claims that without such a statutory requirement, the State has no real, measurable responsibility.

We cannot view the State's obligation only in terms of statutory expression of responsibility. In *Hess*, the United States Supreme Court explained that the inquiry must be "[i]f the expenditures of the enterprise exceed receipts, is the State in fact obligated to bear and pay the resulting indebtedness of the enterprise? When the answer is 'No' — *both legally and practically* — then the Eleventh Amendment's core concern is not implicated." *Hess*, 513 U.S. at 51 (emphasis added). Thus, the Fourth Circuit Court of Appeals relied on this language in finding the South Carolina Ports Authority was a state entity despite the absence of statutory language imposing "liability per se on the state for judgments against its Ports Authority." *Ristow v. S.C. Ports Auth.*, 58 F.3d 1051, 1053 (4th Cir. 1995). Under *Hess* the court was required to "employ not only a legal test, but a practical analysis," which the court used to conclude that the "state immers[ed] itself in the pecuniary affairs of the Ports Authority" throughout its existence in the form of obligation bonds periodically issued to pay for improvements. *Id.* The court concluded that the Ports Authority was a state entity because South Carolina provided whatever economic support it required to endure. *Id.* at 1054-55; see also *Mancuso v. N.Y. State Thruway Auth.*, 86 F.3d 289, 296 (2d Cir. 1996) (holding thruway authority not a state agency).

Looking practically as well as legally in this case, the Legislature establishes the System's payment responsibilities and must ensure those can be met. Plaintiff does not suggest that the Legislature has ever underfunded the System to the extent that benefits were not paid in accordance with law. Whether it follows an actuary's recommendation in doing so in any given year is unimportant.

Second, plaintiff argues that she is seeking only the reimbursement of the money she put into the System so no state funding is involved. This argument is disingenuous. What plaintiff actually seeks is an increase in her retirement benefits with no extra contribution on her part. Inevitably and eventually, those increased benefits must be paid through state appropriations.

Finally, plaintiff argues that since the State contributes on an actuarial basis, any effect on the state treasury will be diffused over the years, and thus the burden upon the State will be decreased. This argument is similar to that rejected in *Fitzpatrick v. Bitzer*, 519 F.2d 559 (2d Cir. 1975), in which the plaintiff also sought recovery from a state retirement fund. Because this fund was separate from the state treasury, the plaintiffs claimed sovereign immunity should not apply. *Id.* at 564. The court disagreed, noting that the legislature was required to appropriate money to the retirement fund to maintain actuarially required levels, *id.*

at 565 n.10, and that the plaintiffs' argument "boils down to an assertion that the effect on the general public treasury is permissibly indirect because the state treasury will not feel the pinch until the time comes for the next annual appropriation to the fund." *Id.* at 565. For the same reason, we are not persuaded that the indirect liability means that the State is not ultimately responsible for any judgment.

In summary, we conclude that the first and most important factor, that the State will be responsible to pay any money judgment plaintiff obtains, weighs in favor of finding that the System is an arm of the State of Vermont.

The second factor commonly considered is how much autonomy the entity enjoys in carrying out its functions. See *Carter*, 181 F.3d at 347 (one of three factors the court should examine is the entity's "degree of autonomy from state regulation"); *Benning v. Bd. of Regents of Regency Univ.*, 928 F.2d 775, 777 (7th Cir. 1991) (questioning "whether [the entity] enjoys a substantial degree of political independence from the state"); *Ram Ditta*, 822 F.2d at 457-58 (one factor to consider is "whether the entity exercises a significant degree of autonomy from the state"). Courts have used several indicators to determine how independent an entity is, including whether the agency is separately incorporated, see *Blake*, 612 F.2d at 722, how the entity's governing members are appointed, see *Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 401 (1979), whether it has the right to sue and be sued, see *Fitzpatrick*, 519 F.2d at 565, and how it is defined and described by the statutes and case law pertaining to it. See *Carter*, 181 F.3d at 347.

In this case, the indicators do not all point in one direction. The enabling statute gives the System the "power and privileges of a corporation" and the authority to conduct all of its business in its own name. 16 V.S.A. § 1932. See *N.H. Ret. Sys. v. Sununu*, 489 A.2d 615, 618 (N.H. 1985) (the New Hampshire Retirement System is an incorporated pension trust independent of the executive branch); *Honadle v. Univ. of Vt.*, 115 F. Supp. 2d 468, 472 (D. Vt. 2000) ("UVM's documents of creation specify that the school is formed as a body corporate with the power to sue and be sued as well as own property. Such powers indicate substantial independence from the state."). The statutes do not specifically grant the power to sue and be sued but do give the System the power to "invest and reinvest the funds, and hold, purchase, sell, assign, transfer and dispose of the securities and investments." 16 V.S.A. § 1943(a).

On the other hand, the System is governed by a six member board of trustees, half of whom are high ranking government officials who serve ex officio. See *id.* § 1942(b). These three government trustees are the

commissioner of education, the state treasurer, and the commissioner of banking, insurance, securities, and health care administration. See *id.* § 1942(b)(1)-(3). While these officials do not represent a majority of the board, at least one must support an action.

In practical terms the state treasurer is the most important and powerful member because that official is designated as the custodian of the System's funds, and all payments from such funds must be made by the treasurer or a deputy treasurer. See *id.* § 1943(c). The System handbook notes that while the board is responsible for the investment of the System's funds, the board usually delegates that responsibility to the state treasurer, Vermont Board of Trustees, *State Teachers' Retirement System* 19 (July 1, 1980), and the board's meetings are held in the state treasurer's conference room. *Id.* at 18. Moreover, the day-to-day administration of the System is handled by the Retirement Office, which is part of the Office of the State Treasurer. All those who work in the Retirement Office are state employees. See *id.*

The board is required to keep records of its proceedings that must be open to public inspection, and it must submit an annual report of fiscal transactions. See 16 V.S.A. § 1942(i). The Vermont Attorney General is the board's legal advisor. See *id.* § 1942(j).

██ Although the impact of this second factor is less decisive than that of the first, we conclude on balance that it supports a conclusion that the System is an arm of the State. Looking at both factors together, we conclude that the System is an arm of the State such that sovereign immunity prevents a suit for money damages against it absent some kind of waiver.

This brings us to plaintiff's second major claim on appeal. Apparently she recognizes that if sovereign immunity covers the System and her claim is properly characterized as one sounding in tort governed by the Vermont Tort Claims Act, she will not prevail as decided by the superior court. As a result she argues here that her claim was really for breach of contract, and the State has waived sovereign immunity with respect to such claims. Alternatively she argues that she can sue for damages directly on the statute that obligated the System to give members an explanation of the consequences of converting to Plan B in 1981, *id.* at § 1950(b), and the State has impliedly waived sovereign immunity with respect to such a claim.

We note at the outset that plaintiff's argument has changed as she has moved through the courts. Count I of her complaint provided her main liability theory: "the System negligently breached its statutory and fiduciary duties to provide adequate information to plaintiff." Although

Count II pled a contract theory, it was entirely different from that argued here: that the System breached a duty of fair dealing and good faith by requiring teachers to purchase service credit for service years out of state. We cannot get from plaintiff's complaint the contract theory she is trying to argue here.

We are not suggesting that plaintiff failed to preserve her contract claim theory below. Instead, we are observing that this theory was clearly a fallback position, and, as a result, it is not clearly and definitively set out and the legal argument with respect to it is equally sketchy. It means that our response is likely to be more summary than it would otherwise be.

Plaintiff's argument that her contract claim overcomes sovereign immunity has three logical steps. The first is that her relationship with defendant is contractual so that a violation of her pension rights represents a breach of contract. See *Halpin v. Neb. State Patrolmen's Ret. Sys.*, 320 N.W.2d 910, 914 (Neb. 1982) (pension rights are contractual in nature); *McGrath v. R.I. Ret. Bd.*, 88 F.3d 12, 17 (1st Cir. 1996) ("in general, pensions are to be regarded as a species of unilateral contracts"); *Shapiro v. Kan. Pub. Employees Ret. Sys.*, 532 P.2d 1081, 1082 (Kan. 1975). The second is the State has at least impliedly waived its sovereign immunity for breach of contract claims. See *Smith v. State*, 222 S.E.2d 412, 423-24 (N.C. 1976). The third is that the obligation to provide information about the consequences of switching pension plans is a term of her contract with defendant, the breach of which gives rise to a damages action. We assume, without deciding, that plaintiff is correct on the first two logical steps. We conclude, however, that she is not correct about the third step and narrowly ground our decision on that point.

▮ As defendant points out, the pension dispute cases on which plaintiff relies relate to the entitlement to benefits or its amount. In those cases, plaintiff could fairly argue that the pension contract created a right to the benefits being sought. Here, the alleged "term" deals at best with a collateral matter. Indeed, plaintiff had a specific pension agreement and was considering whether to enter into a new and different one. Under plaintiff's theory, the breach occurred before she entered into the contract for which she describes the State's obligation as a contract term. Clearly, the obligation to provide proper information created by 16 V.S.A. § 1950(b), if any, goes to contract formation rather than performance. The superior court was correct in holding that the State's default would have to be addressed by a misrepresentation or failure to disclose theory rather than a breach of contract.

There is a second reason to reach this result. State-created contract rights may be entitled to constitutional protection. See *Halpin*, 320

N.W.2d at 914. As a result "before governmental action will be held to grant a constitutionally protected contract right, the intent to do this must be expressed in clear and unmistakable language." *Robert T. Foley Co. v. Wash. Suburban Sanitary Comm'n*, 389 A.2d 350, 358 (Md. 1978). Thus there is a "recognized presumption that statutory enactments do not create contractual obligations in the absence of an 'unmistakable' intent on the legislature's part to do so." *McGrath*, 88 F.3d at 19. There is no such unmistakable intent here.

Plaintiff is on even weaker ground when she argues that she can sue for damages based on a violation of the statutory mandate alone, and the State has impliedly waived its sovereign immunity for such a suit. Whether we examine the implied right of action plaintiff seeks, or the doctrine of implied waiver of sovereign immunity on which she relies,* we must ultimately decide that the damages remedy is necessary to enforce the right. See *Shields v. Gerhart*, 163 Vt. 219, 231, 658 A.2d 924, 933 (1995) (private damage remedy for breach of statute generally not available where legislature has created an alternative); Restatement (Second) of Torts § 874A (1979) (court can create private remedy for breach of statute in appropriate cases if "needed to assure the effectiveness of the [statutory] provision"); *State Employees' Ass'n v. Belknap County*, 448 A.2d 969, 972-73 (N.H. 1982) (waiver of sovereign opportunity implied because legislature gave employees vested right to pension and must provide an "appropriate remedy" to enforce this right); *Pellegrino v. R.I. Ethics Comm'n*, 788 A.2d 1119, 1125 (R.I. 2002) (waiver of sovereign immunity implied if necessary to save right from "mere nugatory existence"). We cannot find necessity in this context.

Without attempting to detail them, we believe that plaintiff had alternative remedies which she did not pursue. The statutes specifically authorize the board to correct any benefit mistakes and errors, and plaintiff could have applied to it to remedy the alleged error caused by an inadequate disclosure in 1981. See 16 V.S.A. § 1948. We have held that a citizen can seek extraordinary relief for improper state action despite sovereign immunity. See *Stoneman v. Vergennes Union High Sch. Dist.*, 139 Vt. 50, 55, 421 A.2d 1307, 1310 (1980), *overruled on other grounds by Cronin v. State*, 148 Vt. 252, 257, 531 A.2d 929, 932-33 (1987); *Blake v. Betit*, 129 Vt. 145, 148, 274 A.2d 481, 483 (1971). Thus, if she had acted in a timely fashion, plaintiff could have brought an action under V.R.C.P. 75(a) to review the refusal of the System to provide the relief she sought.

---

* We are not deciding that we will accept the doctrine of implied waiver of sovereign immunity in view of our decisions that sovereign immunity must be "expressly waived by statute." *LaShay*, 160 Vt. at 67, 625 A.2d at 228.

The superior court correctly ruled that plaintiff's action was barred by sovereign immunity.

*Affirmed.*