Dean KENT, Plaintiff,

v.

Officer Jared KATZ, Individually and as a Police Officer for the Town of Colchester, Charles Kirker, Individually and as the Chief of Police for the Town of Colchester, and the Town of Colchester, Defendants.

No. 2:99–CV–189.

United States District Court,
D. Vermont.

May 11, 2001.

452

Thomas C. Nuovo, Bauer, Anderson & Gravel, Burlington, VT, Adele V. Pastor, Corsones & Corsones, Rutland, VT, for plaintiff.

Nancy Goss Sheahan, Joseph Andrews Farnham, McNeil, Leddy & Sheahan, P.C., Burlington, VT, for defendant.

## OPINION AND ORDER

SESSIONS, District Judge.

Dean Kent ("Kent") brought this action against the Town of Colchester ("Colchester"), Colchester Chief of Police Charles Kirker ("Chief Kirker" or "Kirker"), and Colchester Police Officer Jared Katz ("Officer Katz" or "Katz") for alleged misconduct in connection with Katz's arrest of Kent on June 20, 1996. Kent brings his claims under 42 U.S.C. §§ 1983 and 1988 for alleged violations of the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution; Chapter I, Articles 1, 10, 11, and 13 of the Vermont Constitution; and Vermont common law. All of the defendants now move for summary judgment on various grounds. For the reasons that follow, Colchester's motion is **GRANTED**, Kirker's motion is **GRANTED**, and Katz's motion is **GRANTED IN PART** and **DENIED IN PART**.

## I. Background

Because this case is now before the Court on Defendants' motions for summary judgment, the following facts are undisputed or construed in the light most favorable to Kent, the non-moving party.

In the late afternoon of June 20, 1996, Kent and two assistants, Keith Shappy ("Shappy") and Aaron Sterling ("Sterling"), were in the process of clearing and burning brush on Kent's property at 78 Macrae Road in Colchester, Vermont. At some point in the early evening, Kent told his companions that he had to go to "the Duggans' residence." Pl.'s Resp. to No. 28 of Defs.' First Set of Interrogs. and Reqs. to Produc. (Paper 58, Ex. E) [hereafter, "Pl.'s Resp. to Interrog. No. 28"]. Kent then left his property in his Jeep while Shappy and Sterling were to oversee the burn pile. En route to see the Dugganses, Kent drove by his neighbor, Bob Miller, and "wiggled [his] wheel so as to notify him to stop and talk." *Id.* After a brief exchange, Kent continued on to the Duggans residence, but no one was there, so Kent left, stopping at the grocery store to buy some wine. He then headed back home.

Shortly after Kent's departure, Officer Katz, responding to a complaint concerning the fire, arrived at Kent's property. Shappy and Sterling informed Katz that the burn pile belonged to Kent, and that Kent was expected to return shortly. Shappy then offered to go look for Kent, whom he found just up the road on his way back to the property. Shappy warned Kent that Katz was waiting for him.

When Kent arrived back at his property, he parked his car and headed towards Katz.[1] Katz asked Kent if he had a burn

---

1. Katz wrote in his affidavit in support of probable cause that when Kent exited his vehicle, he "walked somewhat unsteadily towards [Katz]. When he was within three feet of [Katz] he stopped and stared at [him]. [Katz] could see his eyes were extremely bloodshot, and he swayed as he stood." DWI Aff. at 1 (Paper 58, Ex. H). When at a later point Kent came within a foot of Katz, Katz claimed that he "could detect a strong odor of intoxicants on [Kent's] breath. His speech was slurred and he was very argumentative." *Id.* Aside from the fact that Kent's eyes were red, which Kent insists is a permanent condition, these assertions appear to be in conflict with evidence presented by Kent that he had not been drinking at all that day and that he did not appear intoxicated or smell of alcohol during his interaction with Officer Katz. *See, e.g.,* Statement of Betty DeRobertis ¶ 13 (Paper 63, Ex. 1) (observing that "[t]here was nothing unusual or slurred about [Kent's] speech" at time of his arrest); Statement of Gary Francis at 1 (Paper 63, Ex. 2) (averring that at no time during the afternoon of June 20, 1996, did Mr. Francis smell alcohol on Kent's breath); Statement of Kathy Lambert (Paper 63, Ex. 3) (statement by tender of bar where Kent spent part of his afternoon on June 20, 1996, asserting that Kent consumed only two club sodas and no alcohol while he

permit and informed Kent that there had been a complaint about his fire. Kent asked Katz who had complained. Katz then remarked that Kent's eyes were red and asked him how much he had been drinking. Kent "sarcastically[2] responded 'Not very much!'" *Id.* He later told Katz that in fact he had not been drinking. *See* Dep. of Jared Katz at 57 (Paper 63, Ex. 10) [hereafter, "Katz Dep."].

The officer asked Kent to submit to a "breath test," to which Kent responded "Why do I have to do that?" *See* Pl.'s Resp. to Interrog. No. 28. Katz asked if Kent was refusing to submit and Kent asserted that he "was on [his] own property and [he] was not driving." *See id.* Finally, Katz said he was "going to take [Kent] in" and asked him to turn around and place his hands by his sides. *See id.* Kent complied, stating "something to the effect that: 'This is ridiculous!'" *Id.*

After Kent had turned around and placed his arms by his sides, Officer Katz "grabbed" Kent's left arm and at the same time began to twist Kent's right hand and wrist. *See id.* Because of the arthritis in Kent's neck and right shoulder, Kent's right arm would not move behind his back. Kent said to Officer Katz, "It won't move," several times. *See id.* In the meantime, Officer Katz repeatedly asked Kent to "[s]top resisting [him]." *See id.*

Katz then kicked Kent's left foot out from underneath him and threw his body onto the hood of the police cruiser. Kent

asserts that at this point, "[t]he pain became excruciating from [his] right hand all the way up [his] right arm/shoulder and into the base of [his] head."[3] *Id.* Katz then kicked Kent's right foot out from under him and threw him onto the ground. Kent told Katz that he was hurting him. Shappy told Officer Katz that Kent had "chronic" or "bad arthritis." *See* Dep. of Keith Shappy at 23 (Paper 63, Ex. 9). Katz again said that Kent should stop resisting him and threatened to "pepper" him. Fortunately, however, one of the onlookers (probably Shappy) warned Katz that Kent had bad allergies, so Katz did not carry out this threat.

At that point, Kent felt an extreme pain through his right side and "fe[lt] [his] body thrown into shock." Pl.'s Resp. to Interrog. No. 28. He remembers being hoisted by his handcuffs off the ground and placed into the cruiser. He was then taken to the station and processed for suspicion of Driving While Under the Influence (DUI), in violation of Vermont law. He refused to give a sample of his breath. After the police finished processing Kent, they offered him emergency medical assistance, which he also refused, stating that he would get his own doctor. Kent then took a taxi home.

Three days later, Kent was diagnosed with an acute fracture of his right distal radius and an associated ulna styloid fracture, i.e., a broken right wrist.

---

was there, that Kent "seemed normal at all times," and that Lambert did not detect any alcohol on Kent's breath). Therefore, while the Court notes the discrepancy here, for purposes of summary judgment it is obliged to consider the evidence in the light most favorable to Kent.

**2.** His response was sarcastic, Kent asserts, because he "had not had wine since the previous day between 6:00 and 7:00 p.m." *Id.*

**3.** Even Katz admitted that he "felt a change in Mr. Kent's wrist" when he "was holding [Kent's] wrist while he was against the cruiser." Katz Dep. at 146. He said that it "[f]elt like a lessening of resistance in the wrist ... itself." *Id.*

On July 16, 1996, a Chittenden County District Judge found probable cause for Kent's DUI prosecution, relying on the affidavit submitted by Katz. On January 15, 1997, pursuant to a plea agreement with the state's attorney, Kent pleaded "no contest" to Careless and Negligent Operation for having turned his steering wheel back and forth within his lane. *See* Information by State's Att'y (Paper 58, Ex. V) (amended by hand on Jan. 15, 1997). He was not convicted of DUI.

Chief Kirker was not present during Kent's arrest or his DUI processing, and only learned about the arrest days after its occurrence.

Kent filed the instant lawsuit against Defendants in Chittenden Superior Court in Vermont on June 9, 1999, and Defendants removed the case to this Court on July 1, 1999. There are three counts in Kent's complaint. In the first, he alleges that Katz violated his rights under 42 U.S.C. § 1983 and the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution by,

> among other actions, physically assaulting and battering Plaintiff, arresting him falsely and without due process, using excessive force, refusing to provide Plaintiff timely medical assistance, invading his privacy, illegally searching and seizing him, causing him extreme physical, mental and emotional pain and suffering, humiliation, causing him to incur criminal defense attorney's fees and infringing on his right to free speech and right to question governmental authority.

Verified Compl. ¶ 30 (Paper 5) [hereafter, "Compl."]. Kent further alleges that Kirker and Colchester "have, as a matter of policy, custom and practice, and with deliberate indifference to the rights of citizens, failed to properly supervise or train Defendant Katz concerning the rights of citizens,

thereby causing Defendant Katz to engage in the unlawful conduct described above." *Id.* ¶ 31.

Count II is brought under Vermont common law and includes a variety of claims, including assault and battery, false arrest, and malicious prosecution. In Count III, Kent alleges that Katz violated his rights under Chapter I, Articles 1, 10, 11, and 13 of the Vermont Constitution by "illegally violating his right to life and liberty, infringing on his freedom of speech and expression, and right to question governmental authority, falsely arresting and detaining him, illegally searching and seizing his person and using excessive force against him and denying him medical treatment." *Id.* ¶ 39. Kent seeks to hold Kirker and Colchester liable as well for all of his state law claims, both vicariously and for their alleged failure to properly supervise, train, and discipline Katz.

All three defendants now move for summary judgment on all of Kent's claims. Katz and Kirker assert that they are entitled to qualified immunity on all of Kent's claims, both federal and state; that Kent's claims of excessive force and assault and battery must fail because nothing Katz is alleged to have done constitutes assault, battery, or excessive force; that Kent's claims of false arrest, false imprisonment, illegal search and seizure, and malicious prosecution, under either federal or state law, are barred by the complete defense of conviction; that Kent's claims of invasion of privacy, infringement of right to free speech, failure to provide timely medical assistance, and infliction of emotional distress are barred by the fact that he was convicted and, in any event, fail as a matter of law; and that Kent's claims against Kirker for failure to train, supervise and discipline Katz fail as a matter of law.

Colchester asserts that it is entitled to summary judgment because (1) Kent can

produce no evidence that Colchester or Kirker had an official policy, custom, or practice that deprived him of his rights, and thus his federal claims must fail; and (2) Kent's state law claims against Colchester are barred by the defense of municipal immunity.

## II. Legal standards

### A. Summary Judgment

Summary judgment should be granted when "there is no genuine issue as to any material fact, and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). This standard places the initial burden on the moving party to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quotation marks omitted). Once the moving party has demonstrated the absence of any genuine issue of material fact, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is mandated, however, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

### B. Qualified Immunity

#### 1. Federal law

"The doctrine of qualified or good faith immunity shields police officers from being subject to personal liability for damages." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 127 (2d Cir.1997). A police officer is entitled to qualified immunity from claims brought under federal law if either (1) his conduct does not violate clearly established rights of which a reasonable person would have known, or (2) it was objectively reasonable at the time for him to believe that his actions were lawful. *See Cerrone v. Brown*, 246 F.3d 194, 199–200 (2d Cir. 2001). "The availability of the defense depends on whether a reasonable officer could have believed his action to be lawful, in light of clearly established law and the information [he] possessed." *Marshall v. Sullivan*, 105 F.3d 47, 53 (2d Cir.1996) (quotation marks and emphasis omitted) (alteration in original). Moreover, summary judgment on the basis of qualified immunity is appropriate when the only conclusion a rational jury could reach is that reasonably competent police officers could under the circumstances disagree about the legality of the defendant-officer's conduct. *See Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir.1995).

#### 2. Vermont law

■ Government officials are also accorded qualified immunity under Vermont law, although the test is framed somewhat differently. Under Vermont law, qualified immunity "extends to individuals (1) acting during their employment and acting, or reasonably believing they are acting, within the scope of their authority; (2) acting in good faith; and (3) performing discretionary, as opposed to ministerial acts." *Levinsky v. Diamond*, 151 Vt. 178, 185, 559 A.2d 1073, 1078 (1989), *overruled on other grounds by Muzzy v. State*, 155 Vt. 279, 583 A.2d 82 (1990); *see also Napolitano v. Flynn*, 949 F.2d 617, 622 (2d Cir. 1991) (applying Vermont law).

■ With respect to the second prong, Vermont recognizes a presumption of good faith on the part of government officials, which the plaintiff can overcome if he satisfies a two-part test. *See id.* at 623. First, the plaintiff must show that the defendant violated one of his clearly established rights. *See id.* And, second, he must show that "the government official reasonably should have known that his actions violated the rights asserted by the plaintiff." *Id.*

■ As to the third prong, "[a] government official's actions are 'discretionary' when the official exercises professional judgment in performing the actions. The official's actions are 'ministerial,' on the other hand, when nothing is left to discretion, and the official acts according to a definite duty, imposed by law...." *Id.* at 622. (citation and some quotation marks omitted) (second alteration in original).

## III. Discussion

### A. Colchester's motion for summary judgment

#### 1. Kent's federal claims

■ In order for Kent to hold Colchester liable on his § 1983 claims, he must show that the violation of his constitutional rights resulted from a municipal policy or custom. *See Zahra v. Town of Southold,* 48 F.3d 674, 685 (2d Cir.1995); *Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir.1993); *Decker v. Fish,* 126 F.Supp.2d 342, 345 (D.Vt.2000). Such "a municipal policy may be inferred from the informal acts or omissions of supervisory municipal officials, and ... municipal inaction such as the persistent failure to discipline subordinates who violate [persons'] civil rights could give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct." *Zahra,* 48 F.3d at 685 (citation and quotation marks omitted)

(alteration in original). However, "[t]he mere assertion ... that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference." *Dwares,* 985 F.2d at 100 (*quoted in Zahra,* 48 F.3d at 685). "Similarly, the simple recitation that there was a failure to train municipal employees does not suffice to allege that a municipal custom or policy caused the plaintiff's injury." *Id.*

Kent asserts two bases for concluding that Colchester had an official policy or custom that led to the alleged civil rights violations here. First, he asserts that Chief Kirker is the final policy maker of Colchester regarding excessive force and that Kirker has established a "policy" "that even if there is no threat from a suspect, no fear of escape from a suspect and the offense is a misdemeanor, [an] officer should continue to twist an already broken arm rather than find some other means to complete his arrest...." Pl.'s Opp. to Summ.J. for Colchester and Kirker at 10 (Paper 66) [hereafter, "Pl.'s Opp. to Colchester, Kirker"] (citing Dep. of Charles Kirker at 80 (Paper 67, Ex. 12)). This description of Kirker's "policy," however, grossly misconstrues Kirker's deposition testimony. In fact, on the page cited by Kent, Kirker asserted that if, during an arrest for a misdemeanor, a police officer realizes that he may have accidentally broken a suspect's arm, he should nevertheless continue the arrest, and then seek treatment for the arrestee's injuries as soon as that has been accomplished. Moreover, contrary to Kent's assertions, this "policy" does not contradict the written policy as provided in the police manual, which requires simply that officers use no more force than necessary to make an arrest.

Second, Kent asserts that he can establish municipal liability for his § 1983 claims through "Kirker's failure to adequately investigate his complaint and the policy of keeping complaint investigations and results confidential from other officers." *Id.* at 11. At the outset, it should be noted that Kirker testified in his deposition that he tried to investigate Kent's complaint by asking one of his lieutenants to call and interview Kent, to which Kent responded that "he had retained an attorney and that [they] would have to talk to his attorney." Dep. of Charles Kirker at 44 (Paper 66, Ex. 15). After that, Kirker "asked for a review of [Kent's] case by one of the use of force instructors that the Department had." *Id.* at 44–45. Kirker could not recall if he ever interviewed any of the other witnesses, or if he reviewed any affidavits other than the one written by Katz.

In general, a single incident will not suffice to raise an inference of the existence of a custom or policy.[4] *See Dwares,* 985 F.2d at 100. In any event, Kirker's description of how he handled this incident does not appear unreasonable. Moreover, Kent has failed to show how Colchester's policy of keeping such investigations confidential led to the alleged civil rights violations of which Kent now complains. Importantly, the uncontroverted[5] evidence demonstrates that Officer Katz received basic training through the Vermont Criminal Justice Training Council ("VCJTC") in 1992, and that as part of that training, he received instruction in arrest and use-of-force. *See* Aff. of Charles Kirker ¶ 4 (Paper 55, Ex. A). Moreover, Colchester police officers are required by VCJTC to complete annual certified in-service training. *Id.* ¶ 5. During each year that Katz was employed by the Colchester Police Department, his training hours exceeded the requirements set forth by VCJTC and he received annual training in use-of-force. *Id.*

Thus, the Court finds that no reasonably competent evidence has been presented that would tend to establish that Colchester had an official policy or custom of inadequate training or supervision (or any other policy, for that matter) which led to the alleged constitutional deprivations in this case. Therefore, summary judgment on Kent's federal claims against Colchester must be granted.

### 2. Kent's state claims

■ Kent's state claims against Colchester are defeated by the defense of municipal immunity. In Vermont, "municipalities can only be held liable for injuries arising from their proprietary, as opposed to governmental, duties." *Decker,* 126 F.Supp.2d at 346. This Court has already held that police work is a "quintessential governmental function." *Id.* (citing *Clain v. City of Burlington,* 202 F.2d 532, 533

---

4. Kent also asserts that "[t]here are numerous other use of force reports which should have required further investigation.... None of these incidents appear to be investigated and in each case there [sic] are reviewed and determined to be 'justified' based on the officer's statements." Pl.'s Opp. to Colchester, Kirker at 14 (citing "Exhibit 17" (Paper 67, Ex. 17)). According to Defendants, however, "Exhibit 17" is only a sampling of the use of force reports that Defendants provided in discovery. *See* Defs.' Reply Mem. in Resp. to Pl.'s Opp. to Summ.J. for Colchester and Kirker at 5 (Paper 70). Therefore, it is hard to see how it can establish that Colchester had a policy of "fail[ing] to properly supervise or train Defendant Katz concerning the rights of citizens...." Compl. ¶ 31.

5. Kent appears to dispute that this evidence exists. *See* Kent's Local Rule 7.1(c) Resp. to Kirker and Colchester's Statement of Undisputed Material Facts ¶ 2 (Paper 67). He offers no evidence to contradict the affidavit by Kirker, however, so the Court must accept this evidence as undisputed.

(2d Cir.1953)). Therefore, municipalities, such as Colchester, "are immune from state law claims arising from injuries caused by the operation of their police departments." *Id.* Thus, Colchester's motion for summary judgment on Kent's state law claims is granted.

## B. Kirker's motion for summary judgment

Kent seeks to hold Kirker individually liable under § 1983 for his alleged failure to properly supervise or train Katz "concerning the rights of citizens." Compl. ¶ 31. In his state law counts, Kent seeks to hold Kirker liable both under a *respondeat superior* theory and for his alleged failure to train or supervise Katz.

All of Kent's claims against Kirker for his alleged failure to properly supervise or train Katz, whether under federal or state law, must be dismissed because Kent has failed to present any reasonably competent evidence that Kirker did not properly train or supervise Katz. As noted above, the uncontroverted evidence supports the opposite conclusion. Katz received more than adequate training every year that he has been employed with the Colchester Police Department. Moreover, Kent's arguments to the contrary notwithstanding, nothing in Kirker's deposition appears to materially contradict the Colchester Police Department's written use-of-force policy. Therefore, the Court finds that in the record before it, there is no basis upon which it could conclude that Kirker has failed to properly train and supervise Katz or any of his other employees.

Kent's only remaining claims against Kirker are his state claims, based on a *respondeat superior* theory. The Court assumes that any such claims would be against Kirker in his official capacity only.[6] However, "[o]fficial-capacity suits ... 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (quoting *Monell v. N.Y.C. Dep't of Soc. Servs.,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)); *see also Dwares,* 985 F.2d at 100 ("claims against individual municipal employees in their official capacities ... are tantamount to claims against the municipality itself"). Thus, municipal officials sued in their representative (as opposed to personal) capacities should be protected by the same immunities as the municipality itself. In Vermont, as the Court holds above, a municipality cannot be liable for state law claims arising out of the operation of its police department. Therefore, as a municipal official sued in his representative capacity, neither can Chief Kirker. Thus, all of Kent's claims against Kirker are dismissed.

## C. Katz's motion for summary judgment

### 1. Kent's federal constitutional claims

The Court reads Count I as including a false arrest claim, a malicious prosecution claim,[7] an excessive force claim, a claim for denial of medical treatment, and a First Amendment claim, all under 42 U.S.C. § 1983. The Court addresses each of these claims in turn.

---

6. The Supreme Court has explained that, unlike official-capacity suits, "[p]ersonal-capacity suits seek to impose personal liability upon a government official *for actions he takes* under color of state law." *Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (emphasis added).

7. Although Kent did not explicitly include a malicious prosecution claim in Count I, the count is worded broadly enough to encompass one, and since Defendants address it in their motion, the Court addresses it as well.

### a. False arrest

Without a doubt, "[t]he right to be free from arrest . . . in the absence of probable cause is a long established constitutional right." *Ricciuti*, 124 F.3d at 128. While Katz correctly asserts that " '[t]here can be no federal civil rights claim for false arrest where the arresting officer had probable cause,' " Individ. Defs.' Mem. of Law in Supp. of Mot. for Summ.J. at 12 (Paper 57) (quoting *Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995)), Katz relies only on the fact that the Chittenden County District Judge found probable cause for Kent's DUI prosecution to support the proposition that Katz had probable cause to arrest Kent. However, the district judge's finding was based solely on an affidavit submitted by Katz, and Katz does not cite a single case (nor has the Court found one) that stands for the proposition that such a finding is dispositive on the issue of probable cause for purposes of a later false arrest claim.[8] In fact, looking at the totality of the circumstances and construing the evidence in the light most favorable to Kent, material factual questions remain as to whether Katz had probable cause to arrest Kent. In particular, the Court relies on the numerous statements submitted by people who saw Kent the day of his arrest who said that they did not see him consume any alcohol, that he did not appear drunk at any point, and that they never detected alcohol on Kent's breath. These statements support a finding that Kent may not have been drinking on the day of his arrest and that therefore Katz did not have probable cause to arrest him for DUI.

Moreover, construing the available evidence in the light most favorable to Kent, material issues of fact remain as to whether it was objectively reasonable for Katz to believe that the arrest was lawful. Nor is the Court certain that "the only conclusion a rational jury could reach is that reasonably competent police officers could under the circumstances disagree about the legality of the arrest." *Ricciuti*, 124 F.3d at 128. Thus, Katz is not entitled to qualified immunity on Kent's false arrest claim and Katz's motion for summary judgment as to that claim must be denied.[9]

### b. Malicious prosecution

To successfully assert a malicious prosecution claim under § 1983 in

---

**8.** Moreover, any such rule would be unwise, since officers acting in bad faith could always insulate themselves from later false arrest claims simply by submitting false affidavits to the judges responsible for making findings regarding probable cause. *Cf. Jones v. Cannon*, 174 F.3d 1271, 1285 n. 8 (11th Cir.1999) (A "magistrate judge's decision to issue an arrest warrant, based on false statements necessary to the probable cause, does not absolve the police officer from liability, where the police officer who applied for the warrant used false statements to establish probable cause. Likewise, a subsequent grand jury indictment does not retroactively provide probable cause for a false arrest that had already taken place. . . . [T]he indictment does not absolve the officer from liability for the initial false arrest made without any arguable probable cause.") (citations omitted).

**9.** In the actual motion for summary judgment, the individual defendants state that Kent's claims of false arrest and false imprisonment are barred by the complete defense of conviction. *See* Individ. Defs.' Mot. for Summ.J ¶ 3 (Paper 56). The defendants never seem to take up this argument, however, in the memorandum in support of their motion. In any event, the rule is that "in actions asserting false arrest or imprisonment, a plaintiff can never recover if he was convicted of the offense *for which he was arrested.*" *Decker*, 126 F.Supp.2d at 347 (citing *Cameron v. Fogarty*, 806 F.2d 380, 387 (2d Cir.1986)) (emphasis added). Kent was never convicted of DUI, the offense for which he was arrested, but rather, for a lesser, unrelated offense. Therefore, the rule in *Decker* does not apply.

Vermont,[10] "[a] plaintiff must demonstrate that the defendant initiated the prosecution (1) without probable cause (2) with a malicious intent, and (3) the proceeding terminated in plaintiff's favor." *Tveraas,* 818 F.Supp. at 79. Katz asserts that in this case there was no malice and that the proceeding did not terminate in Kent's favor. The Court disagrees with Katz that it can conclude at this stage that there was no malice for purposes of Kent's malicious prosecution claim, since, "[u]nder Vermont law, evidence of want of probable cause, or initiation of action in bad faith is sufficient to support a claim of malice." *Id.* The Court has already held that factual questions remain as to whether Katz had probable cause to arrest Kent. By the same token, factual issues remain as to whether Katz had probable cause to initiate a prosecution against Kent, which is a slightly different inquiry. *See Posr v. Court Officer Shield No. 207,* 180 F.3d 409, 417 (2d Cir.1999) (noting that probable cause to arrest is not the same as probable cause to believe that someone could be successfully prosecuted for purposes of a § 1983 malicious prosecution claim).

■ The Court agrees with Katz, however, that Kent cannot prove the third element of his malicious prosecution claim—that the proceedings terminated in his favor. Although it appears that the Vermont Supreme Court has never specifically addressed whether a guilty plea to a lesser, unrelated offense can constitute termination in favor of the accused for purposes of a later malicious prosecution claim, this Court believes that the Vermont Supreme Court would hold that it cannot. Malicious prosecution claims are generally disfavored by the law since they tend to deter citizens from bringing valid

claims. *See Chittenden Trust Co. v. Marshall,* 146 Vt. 543, 549, 507 A.2d 965, 969–70 (1986). Moreover, the general rule is that "[a] termination of criminal proceedings in favor of the accused other than by acquittal is not a sufficient termination to meet the requirements of a cause of action for malicious prosecution if ... the charge is withdrawn or the prosecution abandoned pursuant to an agreement of compromise with the accused...." *Restatement (Second) of Torts* § 660(a) (1977). Also, in other jurisdictions, in the absence of an acquittal on the merits, a proceeding is deemed to have ended in favor of the accused for purposes of a malicious prosecution claim only when the plaintiff has shown that its final disposition is indicative of innocence. *See, e.g., Murphy v. Lynn,* 118 F.3d 938, 948 (2d Cir.1997) (construing New York law); *Russell,* 68 F.3d at 36 (same).

The criminal proceedings against Kent ended in a conviction pursuant to a plea bargain. Thus, under the general rule as stated in the Restatement, Kent cannot establish that those proceedings terminated in his favor. Further, the fact that Kent pled "no contest" to a lesser (even if unrelated) charge does nothing to establish his innocence as to the original DUI charge. Rather, the termination leaves open the question of Kent's guilt or innocence on the DUI charge. However, as the plaintiff, Kent has the affirmative burden of proving the elements of his malicious prosecution claim. Since the termination provides no indication of his actual innocence, Kent cannot prove the favorable termination element. Therefore, Kent's malicious prosecution claim under § 1983 must be dismissed.

10. State law governs a claim of malicious prosecution brought under § 1983. *Russell v. Smith,* 68 F.3d 33, 36 (2d Cir.1995); *Tveraas*

*v. Coffey,* 818 F.Supp. 75, 79 (D.Vt.1993), *appeal dismissed,* 9 F.3d 1536 (2d Cir.1993).

### c. Excessive force

■ Kent's claim that Officer Katz used excessive force in effecting his arrest is properly analyzed under the Fourth Amendment. The Second Circuit has held that

[a] claim that excessive force was used in the course of a seizure is subject to an objective test of reasonableness under the totality of the circumstances, which requires consideration of the specific facts in each case, including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of others and whether he [wa]s actively resisting arrest.

*Sullivan v. Gagnier*, 225 F.3d 161, 165 (2d Cir.2000) (per curiam). Viewing the totality of the circumstances in this case in the light most favorable to Kent, the Court must conclude that material issues of fact remain as to whether the force used by Officer Katz was excessive. In finding that Katz has failed to establish at this point in the litigation that the force he used was not excessive, the Court specifically relies upon evidence submitted by Kent tending to establish that he never resisted arrest, that he informed Officer Katz that Katz was hurting him, that someone told Officer Katz about Kent's arthritis, that Kent was never charged with a crime involving violence or the threat thereof, and that Kent's injuries were so severe, *see* Photographs of Kent's injuries (Paper 63, Ex. 13).

■ Furthermore, the Court cannot, at this stage of the proceedings, conclude that Katz should be entitled to qualified immunity on Kent's excessive force claim. Material issues of fact remain as to whether Katz violated Kent's clearly established rights, and as to whether it was objectively reasonable for Katz to believe that the amount of force he used was lawful. Again, the Court simply is not confident that the only conclusion a rational jury could reach is that reasonably competent police officers could under the circumstances disagree about the legality of Katz's conduct. *See Lennon,* 66 F.3d at 421. Thus, Katz is not entitled to qualified immunity on Kent's excessive force claims and Katz's motion for summary judgment as to that claim must be denied.

### d. Denial of medical treatment

Kent's § 1983 claim includes a claim that Katz "refus[ed] to provide [Kent] timely medical assistance." Compl. ¶ 30. However, Kent does not even allege that he requested such assistance. Further, it is undisputed that when Katz did offer Kent medical treatment shortly after his arrest, Kent refused, stating that he would get his own doctor. Thus, the Court agrees with Katz that Kent's denial of medical treatment claim must fail as a matter of law. Summary judgment in favor of Katz is therefore granted on that claim.

### e. First Amendment

The Court is unable to discern a viable First Amendment claim in any of Kent's pleadings, nor how such claim could be linked to damages separate from those arising from the alleged false arrest. Furthermore, Kent does not address Katz's summary judgment motion with respect to Kent's First Amendment claim anywhere in his opposition to that motion. *See* Pl.'s Opp. to Summ.J. for Katz (Paper 63) [hereafter, "Pl.'s Opp. to Katz"]. Thus, Katz's motion for summary judgment on Kent's First Amendment claim must also be granted.

### 2. Kent's state common law claims

### a. Assault and battery

■ "At common law, the civil tort of assault is defined as 'any gesture or threat of violence exhibiting an attention

[sic] to assault, with the means of carrying that threat into effect ... unless immediate contact is impossible.'" *Billado v. Parry,* 937 F.Supp. 337, 343 (D.Vt.1996) (quoting *Bishop v. Ranney,* 59 Vt. 316, 318, 7 A. 820 (1887)) (alterations in original). Moreover, if the party threatening the assault has "'the ability, means, and apparent intention, to carry his threat into execution, it may in law constitute an assault.'" *Wilson v. Smith,* 144 Vt. 358, 360, 477 A.2d 964, 965 (1984) (quoting *Clark v. Downing,* 55 Vt. 259, 262 (1882)).

■ The elements of the civil tort for battery have been stated by one treatise as follows:

An actor is subject to liability to another for battery if

(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and

(b) a harmful contact with the person of the other directly or indirectly results.

*Restatement (Second) of Torts* § 13 (1977).

■ As with Kent's excessive force claim, there are material issues of fact still in dispute as to whether Katz's actions constituted an assault and/or battery on Kent. Moreover, Katz is not entitled to qualified immunity on this claim. Kent has successfully rebutted the presumption that Katz was acting in good faith, since there is little question that Kent had a clearly established right to be free from assault and battery, and material issues of fact remain as to whether Katz violated that right and whether he reasonably should have known that he violated it. Therefore, summary judgment on Kent's assault and battery claim is denied.

### b. False arrest/imprisonment

Summary judgment on Kent's common law claim for false arrest/imprisonment cannot be granted for the same reasons articulated with respect to his Fourth Amendment false arrest claim. Kent has submitted numerous affidavits and deposition testimony supporting his assertion that he had not had anything to drink on the day of his arrest, that he did not appear drunk, and that he did not have alcohol on his breath. Thus, factual questions remain as to whether Katz had probable cause to arrest Kent and as to whether Katz was acting in good faith. The fact that a judge made a finding of probable cause based on Katz's affidavit does not change the Court's conclusion on this issue. Moreover, because material questions remain as to whether Katz reasonably should have known that he was violating Kent's right to be free from arrest without probable cause, Katz is not entitled to qualified immunity on this claim.

### c. Malicious prosecution

■ Summary judgment on Kent's common law malicious prosecution claim must be granted for the same reasons as those articulated with regard to his federal malicious prosecution claim. The elements of both the federal and state causes of action are identical, and under the undisputed facts of the case, Kent cannot establish that the criminal proceedings terminated in his favor. Thus, his common law malicious prosecution claim cannot stand.

### 3. Kent's state constitutional claims

Kent asserts claims under Articles 1, 10, 11, and 13 of Chapter I of the Vermont Constitution. The Court agrees with Katz that all of Kent's state constitutional claims must be dismissed.

■ In Vermont, there is no private right of action for money damages for violations of the Vermont Constitution unless (1) the constitutional provisions in-

volved are self-executing (that is, "they support an action against the state or its agents without implementing legislation") and (2) "monetary damages are available as a remedy for a violation." *Shields v. Gerhart*, 163 Vt. 219, 222, 658 A.2d 924, 927 (1995). Kent essentially concedes that Article 1 is not self-executing. *See* Pl.'s Opp. to Katz at 20; *see also Shields*, 163 Vt. at 226, 658 A.2d at 929 (holding that Article 1 is not self-executing). Therefore, the Court need only address his claims under Articles 10, 11, and 13.

Article 13, which has been held to be self-executing, *see Shields*, 163 Vt. at 227, 658 A.2d at 930, is the Vermont counterpart to the First Amendment of the United States Constitution, essentially protecting free speech and free press. However, Kent's free speech claim under the Vermont Constitution has no more merit than his First Amendment claim. Kent has failed to show how his rights to free speech were implicated on these facts or how damages stemming from such claims would be separable from the damages stemming from his alleged false arrest. Therefore, Kent's claim under Article 13 of Chapter I of the Vermont Constitution is without merit, and must be dismissed.

 Kent's claims under Articles 10 and 11 are dismissed under the doctrine of qualified immunity. Article 10 [11] provides, in relevant part: "nor can any person be justly deprived of liberty, except by the laws of the land, or the judgment of his peers. . . ." Vt. Const. Ch. I, Art. 10. Article 11 provides, in relevant part, that "the people have a right to hold themselves . . . free from search and seizure." Vt. Const.

Ch. I, Art. 11. There can be no question that Officer Katz was acting within the scope of his employment and that his actions were discretionary. Thus, the only question is whether he was acting in good faith.

Kent cannot rebut the presumption under Vermont qualified immunity law that Katz was acting in good faith with respect to Kent's remaining state constitutional claims because he has not even alleged (much less *shown*) that the rights covered by Chapter I, Articles 10 and 11 of the Vermont Constitution were "clearly established" at the time of Kent's arrest. *See Napolitano*, 949 F.2d at 623. Thus, Katz is entitled to qualified immunity on Kent's claims under these provisions.[12] Summary judgment as to all of Kent's state constitutional claims must be granted.

## IV. Conclusion

Wherefore, the Court **GRANTS** summary judgment in favor of Colchester and Chief Kirker as to all of Kent's claims. Katz's motion for summary judgment is **GRANTED** with respect to Kent's malicious prosecution, denial of medical treatment, and First Amendment claims under § 1983, his common law malicious prosecution claim, and all of his state constitutional claims. Katz's motion for summary judgment is **DENIED** with respect to Kent's false arrest and excessive force claims under § 1983, and his false arrest and assault and battery claims under Vermont common law.

---

11. This article is self-executing. *See Billado*, 937 F.Supp. at 345.

12. Moreover, the Court notes that any damages stemming from claims that Kent might have under these two articles of the Vermont Constitution would be duplicative of damages

stemming from his false arrest claims under the federal constitution and Vermont common law. Therefore, even if Katz were not entitled to qualified immunity, retaining these claims would not ultimately change Kent's prospects for recovery.